COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com

Attorneys for Plaintiff
COASTAL ENVIRONMENTAL RIGHTS FOUNDATION

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation, | Civil Case No.: **'15CV2503 CAB NLS** |
| | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| Plaintiff, | |
| v. | |
| A.O. REED & CO., INC. a California corporation, | **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)** |
| Defendant. | |

Coastal Environmental Rights Foundation, ("CERF" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.  JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (the "Clean Water Act" or the "CWA"). This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.    On September 4, 2015, CERF issued a 60-day notice letter ("Notice Letter") to A.O. Reed & Co., Inc., ("AO Reed" or "Defendant") and the County of San Diego ("County"), regarding their violations of the Clean Water Act, and of CERF's intention to file suit against Defendant. The Notice Letter was sent to the registered agent for AO Reed, Steven B. Andrade, at the facility, as required by 40 C.F.R. § 135.2(a)(2), as well as the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, San Diego Region ("Regional Board") as required by CWA, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of the Notice Letter is attached hereto as Exhibit A and incorporated herein.

3.    More than sixty days has passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in this complaint. (33 U.S.C. § 1365(b)(1)(B)). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

4.    Venue is proper in the Southern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are

located within this judicial district.

## II.   INTRODUCTION

5.      This complaint seeks relief for the Defendant's unlawful discharge of pollutants into waters of the United States from its operations at 4777 Ruffner Street, San Diego, California, 92111 ("AO Reed Facility" or "Site"). Specifically, Defendant discharges storm water runoff from the Site into storm drains, Tecolote Creek, Mission Bay, and ultimately the Pacific Ocean (collectively referred to as the "Receiving Waters"). This complaint also seeks relief for Defendant's violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of California's General Permit for Discharges Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ, as amended by Order No. 97-03-DWQ*) ("Industrial Permit"). This complaint further seeks relief for violations of and to prevent discharges in violation of the Industrial Permit as amended by *Order No. 2014-0057-DWQ*. AO Reed's violations ongoing and continuous violations of the Clean Water Act and the Industrial Permit.

6.      With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the AO Reed Facility, discharge into San Diego storm drain systems, Tecolote Creek, Mission Bay and ultimately the Pacific Ocean. This discharge of pollutants in storm water from industrial activities such as the AO Reed Facility contributes to the impairment of downstream waters and compromises or impairs their beneficial uses.

## III.   PARTIES

### A.   Coastal Environmental Rights Foundation

7.      Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California.

8.      CERF's office is located at 1140 South Coast Highway 101, Encinitas

California, 92024.

9.      CERF was founded by surfers in North San Diego County and active throughout California's coastal communities. CERF was established to aggressively advocate, including through litigation, for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

10.     CERF has over 1,000 members who live and/or recreate in and around Tecolote Creek, Mission Bay, and the Pacific Ocean ("Receiving Waters").

11.     Members of CERF use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife, and engage in scientific study including monitoring activities, among other activities. Defendant discharges pollutants from the Site to the Receiving Waters used by CERF's members. Thus, Defendant's discharge of pollutants impairs CERF's members' uses and enjoyment of the Receiving Waters.

12.     The interests of CERF's members have been, are being, and will continue to be adversely affected by the Defendant's failure to comply with the Clean Water Act and the Industrial Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff's members, for which harm they have no plain, speedy or adequate remedy at law.

**B.      The AO Reed Facility Owners and/or Operators**

13.     CERF is informed and believes that AO Reed is a private corporation organized under the laws of the State of California, and is located in San Diego, California.

## IV.   STATUTORY BACKGROUND

**A.      The Clean Water Act**

14.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies

with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

15.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. (33 U.S.C. § 1342(p)). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. (33 U.S.C. § 1342).

16.     Section 402(b) of the CWA allows each state to administer its own EPA-approved permit for storm water discharges. (33 U.S.C. § 1342(b)). In California, the State Board is charged with regulating pollutants to protect California's water resources.

17.     The Industrial Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA that regulates the discharge of pollutants from industrial sites. (33 U.S.C. § 1342).

18.     Section 505(a)(1) of the CWA provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation… or an order issued by the Administrator or a State with respect to such a standard or limitation." (33 U.S.C. § 1365(a)(1)).

19.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).

20.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring after January 27, 2009. (33 U.S.C. § 1319(d); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §19.4).

21.     Section 505(d) of the Clean Water Act permits prevailing parties to recover costs, including attorneys' and experts' fees. (33 U.S.C. § 1365(d)).

/././

Complaint for Declaratory and Injunctive Relief and Civil Penalties

**B.     California's Industrial Permit**

22.     The Industrial Permit, NPDES General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ  and Order No. 2014-0057-DWQ is an NPDES permit adopted pursuant to Section 402 of the CWA, 33 U.S.C. § 1342(b) and 40 C.F.R § 123.25.  In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Industrial Permit and comply with its terms, or obtain and comply with an individual NPDES permit. The Industrial Permit as amended pursuant to Order No. 2014-0057-DWQ, became effective July 1, 2015 ("New Industrial Permit").

23.     Failure to comply with the Industrial Permit or New Industrial Permit constitutes a Clean Water Act violation. (Industrial Permit, § C.1; New Industrial Permit §XXI.A.).

24.     Discharge Prohibitions A(1) of the Industrial Permit and III.B. of the New Industrial Permit prohibit the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States. Discharge Prohibitions A(2) of the Industrial Permit and III.C. of the New Industrial Permit prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance.

25.     Effluent limitations B(3) of the Industrial Permit and V.A. of the New Industrial Permit require facility operators to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

26.     Industrial Permit Receiving Water Limitation C(1) and New Industrial Permit Receiving Water Limitation VI.B. prohibit storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impacts

human health or the environment.

27.     Industrial Permit Receiving Water Limitation C(2) and New Industrial Permit Receiving Water Limitation VI.A. prohibit storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable water quality standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

28.     Section A(1) and Provision E(2) of the Industrial Permit require dischargers to have developed and implemented a Storm Water Pollution Prevention Plan ("SWPPP") by October 1, 1992, or prior to beginning industrial activities, that meets all the requirements of the Industrial Permit. Sections X.A. and B. of the New Industrial Permit require development and implementation of site-specific SWPPPs by July 1, 2015 or upon commencement of industrial activity.

29.     The objective of the SWPPP is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the Sites, and identify and implement site-specific Best Management Practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges. (Industrial Permit, Section A(2); New Industrial Permit, Section X.C.1).

30.     To ensure its effectiveness, the SWPPP must be evaluated on an annual basis, and it must be revised as necessary to ensure compliance with the Permit. (Industrial Permit, Sections A(9), (10); New Industrial Permit, Sections XA. And X.B.1.).

31.     Sections A(3) through A(10) of the Industrial Permit and Sections X.A to X.I. of the New Industrial Permit set forth the requirements for a SWPPP.

32.     The SWPPP must include a site map showing the facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, and areas of industrial activity. (Industrial

7

Permit, Section A(4); New Industrial Permit, Section X.E.).

33.    Dischargers are also required to prepare and implement a monitoring and reporting program ("M&RP"). (Industrial Permit, Sections E(3), B(1); New Industrial Permit, Section XI).

34.    The objective of the M&RP is to ensure that storm water discharges are in compliance with the Industrial Permit (up to July 1, 2015) and New Industrial Permit (July 1, 2015 and thereafter) Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. (Industrial Permit, Section B(2); New Industrial Permit, Finding J.56).

35.    The Permits require dischargers to conduct visual observations for the presence of unauthorized non-storm water discharges. (Industrial Permit, Section B(3)[quarterly observations required]; New Industrial Permit, XI.A.1.[monthly observations required]).

36.    Dischargers must also visually observe storm water discharges at all discharge locations during the wet season (October 1 - May 30) and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants. (Industrial Permit, Section B(4)[observation of one storm event per month]; New Industrial Permit, XI.A.1[observation at time of sampling]).

37.    Both the Industrial Permit and New Industrial Permit require dischargers to maintain records of observations, observation dates, locations observed, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges. . (Industrial Permit, Sections B(3)(d) and B(4)(c)]; New Industrial Permit, XI.A.1[observation at time of sampling]).

38.    The Industrial Permit requires dischargers to collect a sample from all discharge points during the first storm event of the wet season and during at least one other storm event of the wet season, for a total of two samples per wet season.

8

(Industrial Permit, Section (B)(5)). The New Industrial permit requires dischargers to collect and analyze storm water samples from two storm events with the first half of each reporting year (July 1 to December 31) and two from the second half (January 1 to June 30). (New Industrial Permit, Section XI.B.2.).

39.     Dischargers must analyze each sample for pH, total suspended solids, oil and grease, and for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility. (Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6).

40.     Dischargers must submit "Annual Reports" to the Regional Board in July of each year. (Industrial Permit, Section B(14); New Industrial Permit, Section XVI.A.).

V.     STATEMENT OF FACTS

A.     AO Reed Facility

41.     CERF is informed, believes, and thereon alleges the AO Reed Facility is in the business fabricating air ducts and vents and mechanical contracting. The AO Reed Facility belongs to Sector AA of the Industrial Permit and its standard industrial classification (SIC) code is 3444.

42.     CERF is informed, believes, and thereon alleges the AO Reed Facility includes a sheet metal fabrication shop, a pipe fabrication shop, storage yards, and a parking lot.

43.     CERF is informed, believes, and thereon alleges the Site is comprised of numerous buildings and six drainage areas. CERF is informed, believes, and thereon alleges the Site is approximately 3 acres, with approximately 1.5 acres of industrial activity directly exposed to precipitation and storm water runoff.

44.     CERF is informed, believes, and thereon alleges the Site's outdoor material storage yard includes fabricated sheet metal products, metal pipes, and machine equipment.

45.      CERF is informed, believes, and thereon alleges the loading and unloading area of the Site expose oil and grease, fuel, engine oil, transmission fluid,

coolant, and finished metal products to storm water.

46.     CERF is informed, believes, and thereon alleges that operations at the Site's Sheet Metal Fabrication Shop expose metals, oils, grease and trash to storm water.

47.     CERF is informed, believes, and thereon alleges that storm water is conveyed from the Site's six drainage areas to storm drain inlets or offsite as surface runoff.

48.     CERF is informed, believes, and thereon alleges, the Facility SWPPP reflects there is no run-on to the site.

**B.     AO Reed Discharges to Waters of the United States**

49.     The AO Reed Facility discharges into storm drains that discharge into Tecolote Creek, downstream to Mission Bay, and ultimately the Pacific Ocean.

50.     The EPA's regulations for the Section 402 NPDES permit program define waters of the United States. (S*ee* 40 C.F.R. § 122.2). The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. (40 C.F.R. § 122.21).

51.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributary to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. (*See Rapanos v. United States,* 547 U.S. 715 (2006)).  A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." (*Id.* at 780).

52.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the

reduction of flow, pollutant trapping, and nutrient recycling. (*Id.* at 783).

53.     Information available to CERF indicates that each of the surface waters into which the AO Reed Facility discharges polluted storm water are tributaries to traditional navigable waters, such as Tecolote River, Mission Bay, and the Pacific Ocean.

54.     CERF is informed and believes, and thereon alleges the AO Reed Facility's polluted discharges cause and/or contribute to the impairment of water quality in Tecolote Creek. Elevated levels of cadmium, copper, indicator bacteria, lead, nitrogen, phosphorous, selenium, turbidity and zinc have resulted in the inability of the Tecolote Creek to support its beneficial uses.

55.     Mission Bay is also impaired for bacteria, nutrients and lead at the mouth of Tecolote Creek.

C.    **Applicable Water Quality Standards**

56.     Water Quality Standards are pollutant concentration levels determined by the State Board and the EPA to be protective of the beneficial uses of the receiving waters.  Discharges above Water Quality Standards contribute to the impairment of the receiving waters' beneficial uses.

57.     The applicable Water Quality Standards include, but are not limited to, those set out by the State of California in the Criteria for Priority Toxic Pollutants, 40 C.F.R. § 131.38 , ("California Toxics Rule" or "CTR") and in the Basin Plan. The CTR maximum acute concentration limits are, in part, as follows: lead – .065 milligrams per liter (mg/L); copper – .013 mg/L; zinc – .12 mg/L.[1] These numeric criteria are set to protect human health and the environment in the State of California. The CTR limits represented are the maximum concentration levels permissible to achieve health and environmental protection goals.

58.     EPA Benchmarks are the pollutant concentrations above which EPA has

---

[1] These are freshwater values based on water hardness of 100 mg/L.

Complaint for Declaratory and Injunctive Relief and Civil Penalties

determined are indicative of a facility not successfully developing or implementing BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. (See Multi-Sector General Permits for Stormwater Discharges Associated with Industrial Activity (MSGP), 2015, §§6.2.1, 8.AA, Table 8.AA-1). The benchmark values provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented. (MSGP Fact Sheet, p. 52). Failure to conduct and document corrective action and revision of control measures in response to benchmark exceedances constitutes a permit violation. (*Id*., at p. 65).

59.     EPA has established the following benchmark values for Sector AA, Subsector AA1, Fabricated Metal Products, except coating: iron – 1.0 mg/L; aluminum 0.75 mg/L; zinc[2] – 0.04-.26 mg/L; nitrate plus nitrite nitrogen – 0.068 mg/L. (MSGP, §8.AA.5, Table 8.AA-1).

60.     The Regional Board's Basin Plan establishes water quality objectives, implementation plans for point and nonpoint source discharges, and prohibitions, and furthers statewide plans and policies intended to preserve and enhance the beneficial uses of all waters in the San Diego region. (*See* Basin Plan at 1-1). The Basin Plan identifies several beneficial uses for regional waters, including for Tecolote Creek. The Basin Plan establishes the following water quality objectives for inland surface waters: pH – not less than 6.5 and not greater than 8.5.

**D.     Past and Present Industrial Activity at the AO Reed Facility**

61.     CERF is informed, believes, and thereon alleges that in its Notice of Intent to Obtain Coverage under Industrial Permit submitted to the Regional Board, the Defendant list its operations as Standard Industrial Classification ("SIC") code 3444 for facilities primarily engaged in fabricated metal products ("Sheet Metal Work").

62.     CERF is informed, believes, and thereon alleges that the Defendant engages in manufacturing ducts and pipes, using raw material steels, black iron,

---

[2] The zinc benchmark is dependent on water hardness.

Complaint for Declaratory and Injunctive Relief and Civil Penalties

aluminum, PVC and other materials.

63.     CERF is further informed, believes, and thereon alleges that at its industrial piping fabrication shop, Defendant's employees weld and preassemble piping fixtures.

64.     The potential pollutant sources associated with the industrial activities at the AO Reed Facility include, but are not limited to: equipment and machinery storage areas, which may contribute rust, transmission fluid, coolant, grease and/or oils; loading and unloading operations for paints, chemicals, and raw materials; outdoor storage activities for raw materials, paints, empty containers, chemicals, metal products, and scrap metals; outdoor manufacturing or processing activities such as grinding, cutting, and welding; onsite waste disposal practices for spent solvents, shavings, and refuse and waste piles.

65.     CERF is informed, believes, and thereon alleges that pollutants present in storm water discharged from the AO Reed Facility therefore include but are not limited to: toxic metals such as copper, iron, zinc, lead, and aluminum; petroleum products including oil, fuel, grease, transmission fluids, brake fluids, hydraulic oil and diesel fuel; solvents; total suspended solids and pH-affecting substances; and fugitive and other dust, dirt and debris.

66.     Based upon CERF's investigation, CERF is informed and believes and thereon alleges Defendant stores metal and other materials outside where it is exposed to storm water.

67.      CERF is informed and believes and thereon alleges that there are drums and other containers stored on-Site that are uncovered and/or uncontained.

68.     CERF is informed and believes and thereon alleges that several drains at the AO Reed Facility convey storm water pollution off the site and into area storm drains and the Tecolote Creek drainage channel.

69.     CERF is informed and believes that the AO Reed Facility lacks effective BMPs to control the flow of storm water from the Facility into the Tecolote Creek

drainage channel. As a result, nitrates, metal particles, oil and grease, and other pollutants have been and continue to be conveyed from the AO Reed Facility into the Tecolote Creek drainage channel.

70.     As a result, CERF is informed and believes and thereon alleges that during rain events at the AO Reed Facility, storm water carries pollutants from the outdoor storage areas, bins and dumpsters, floor contaminants, equipment, uncontained metal drums, and other sources directly into the storm drains and Tecolote Creek drainage channel.

71.     CERF is informed and believes and thereon alleges that the AO Reed Facility pollution control measures are ineffective in controlling the exposure of pollutant sources to storm water at the AO Reed Facility.

### E.     The AO Reed Facility and its Associated Discharge of Pollutants

72.     CERF is informed, believes, and thereon alleges that with every significant rain event, the AO Reed Facility discharges polluted storm water from the industrial activities at the facility via the City of San Diego's storm drain system and into the Receiving Waters.

73.     CERF is informed, believes, and thereon alleges that the Receiving Waters into which the AO Reed Facility discharges polluted storm water are waters of the United States and therefore the Industrial Permit and New Industrial Permit properly regulate discharges to those waters.

74.     Because discharges from the AO Reed Facility contain metals, nitrates, and oil and grease, the AO Reed Facility's polluted discharges cause and/or contribute to the impairment of water quality in the Receiving Waters.

75.     CERF is informed, believes, and thereon alleges that the storm water discharged from the AO Reed Facility has exceeded the CTR Water Quality Standards applicable to zinc in California. For example, Defendant's 2013-2014 annual report monitoring data indicates levels of zinc as high as 25.1 mg/L which is over 200 times the CTR limit of .12 mg/L and over 190 times the EPA Benchmark value for zinc of .13

mg/L.[3] (MSGP, §8.AA.5, Table 8.AA.-1).

76.     More recently, Defendant's September 15, 2015 monitoring data also indicates high levels of zinc, with exceedances ranging from 1.14 to 2.33 mg/L.

77.     CERF is informed, believes, and thereon alleges that the storm water discharged from the AO Reed Facility has also exceeded the EPA Benchmark value for aluminum. For example, Defendant's 2012-2013 annual report monitoring data indicates exceedance levels of aluminum as high as 24.7 mg/L, which is over 32 times the EPA Benchmark value for aluminum of .75 mg/L. (MSGP, §8.AA.5, Table 8.AA.-1).

78.     CERF is informed, believes, and thereon alleges that the storm water discharged from the AO Reed Facility has exceeded the EPA Benchmark value for nitrate plus nitrite nitrogen. For example, Defendant's annual report monitoring data indicates exceedance levels of nitrate plus nitrite nitrogen as high as 4.78 mg/L for the 2012-2013 reporting period. The EPA benchmark value for nitrate plus nitrite nitrogen is 0.68 mg/L. (MSGP, §8.AA.5, Table 8.AA.-1).

79.     CERF is informed, believes, and thereon alleges that storm water discharged from the AO Reed Facility has also exceeded the San Diego Basin Plan Water Quality Objective for hydrogen ion concentration (pH). For inland surface waters, the pH Water Quality Objective is a range, from 6.5 to 8.5. Storm water discharged from the AO Reed Facility has historically failed to meet the minimum threshold of 6.5. For example, during the 2012-2013 reporting year, Defendant's monitoring data indicated a pH as low as 2.37.

80.     CERF is informed, believes, and thereon alleges that during every significant rain event that has occurred at the AO Reed Facility since at least September 4, 2010 through the present, Defendant has discharged and continues to discharge storm water from the AO Reed Facility that contains pollutants at levels in violation of the

---

[3] This benchmark value is hardness-dependent. Assuming the 100-125 mg/L water hardness range applies, the benchmark is .13 mg/L.

Complaint for Declaratory and Injunctive Relief and Civil Penalties

prohibitions and limitations set forth in the Industrial Permit and other applicable Water Quality Standards.

81.     CERF is informed, believes, and thereon alleges that City of San Diego inspectors or consultants performed Site visits in 2010, 2011, and 2012 during which they found the Site did not fully implement necessary BMPs. CERF is further informed, believes and alleges, the City of San Diego inspectors or consultants noted sediment, metal shards, leaves, oil, and pallet debris onsite; lack of adequate cover for the trash area; lack of secondary containment for liquids and hazardous materials; uncovered hazardous materials, galvanized metal, rusty metal, and tires; and uncovered outdoor activities, including metal cutting and grinding activities.

82.     CERF is informed, believes, and thereon alleges, from visual observations, sample results, and investigations available to CERF, the Defendant has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the AO Reed Facility. The inadequacy of the BMPs at the AO Reed Facility is a result of the Defendant's failure to develop and implement an adequate SWPPP and companion M&RP for this Site. Therefore, storm water discharges from the AO Reed Facility contain pollutant concentration levels that are above both EPA Benchmarks and applicable Water Quality Standards.

83.     CERF is informed, believes, and thereon alleges that since at least September 4, 2010 through the present, Defendant has failed to develop and implement BMPs that meet the standards of BAT/BCT at the AO Reed Facility in violation of Effluent Limitation B(3) of the Industrial Permit and V.A. of the New Industrial Permit. Each day that Defendant has failed and continues to fail to implement adequate BMPs to achieve BAT/BCT constitutes a separate violation of the Industrial Permit and the CWA.

84.     Based on its investigation of the AO Reed Facility, CERF is informed and believes that Defendant has failed to develop and implement an adequate SWPPP since at least September 4, 2010 through the present. Each day that Defendant has failed and

continues to fail to implement an adequate SWPPP constitutes a separate violation of the Industrial Permit and the CWA.

85.     CERF is informed and believes that Defendant has failed to submit written reports to the Regional Board identifying additional BMPs necessary to achieve BAT/BCT at the AO Reed Facility since at least September 4, 2010, in violation of Receiving Water Limitations C(3) and C(4) of the Industrial Permit and New Industrial Permit Receiving Water Limitation VI.A. Each day that Defendant has operated the AO Reed Facility without meeting this reporting requirement of the Industrial Permit constitutes a separate violation of the Industrial Permit and the CWA.

86.     CERF is informed, believes and thereon alleges, Defendant submitted a Notice of Intent to enroll under the Industrial Permit on or about October 19, 2012. CERF is further informed, believes, and thereon alleges that the Facility has conducted industrial activities at the site since as early as 2010 and therefore unlawfully discharged pollutants without an NPDES Permit until its enrollment in 2012.

**F.     Defendant's Monitoring Program**

87.     The AO Reed Facility is required to sample at least two storm events every rainy season in accordance with the sampling and analysis procedures set forth at Industrial Permit Section B(5). These procedures require that a sample be taken from all discharge locations at the AO Reed Facility and that at least two samples are taken during the wet season: (1) one in the first storm event of a particular wet season; and (2) at least one other storm event in the wet season. (Industrial Permit, Sections B(5) and B(7)).

88.     CERF is informed and believes that despite the extremely high levels of pollutants reported in the samples that were taken at the AO Reed Facility, the Defendant has not sampled as required.

89.     CERF is informed and believes that Defendant has not successfully sampled and reported during the 2010-2011, 2011-2012, and 2014-2015 reporting years by failing to sample the required two storm events, despite there being numerous rain

events sufficient to generate runoff occurring during the business hours at the AO Reed Facility.

90.     Information available to Plaintiff indicates that Defendant has not submitted any reports pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmark values or applicable Water Quality Standards, or filed any reports describing the AO Reed Facility's noncompliance with the Industrial Permit pursuant to Section C(11)(d) of the Industrial Permit.

91.     CERF is informed, believes, and thereon alleges Defendant did not monitor for lead or copper at its discharge points until its last sampling event, on September 15, 2015. Defendant's September 15, 2015 monitoring data reveals lead exceedances of .1 and .21 mg/L and copper exceedances at .21, .11, and .04 mg/L. CERF is informed, believes, and thereon alleges that Defendant's storm water discharge contained excess levels of lead and copper during the last five years, notwithstanding Defendant's failure to monitor these constituents.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in
Violation of the Industrial Permit's Discharge Prohibitions and
Receiving Water Limitations and the Clean Water Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

92.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

93.     Plaintiff is informed and believes, and thereon alleges, that as a result of the operations at the AO Reed Facility, during every significant rain event, storm water containing pollutants harmful to fish, plant, bird life, and human health is discharged from the AO Reed Facility to the Receiving Waters.

94.     Plaintiff is informed and believes, and thereon alleges, that the Defendant's discharges of contaminated storm water have caused and continue to cause pollution, contamination, and/or nuisance to the waters of the United States in violation

of Discharge Prohibition A(2) of the Industrial Permit and Section VI.C of the New Industrial Permit.

95.     Plaintiff is informed and believes, and thereon alleges, that these discharges of contaminated storm water have, and continue to, adversely affect human health and the environment in violation of Receiving Water Limitation C(1) of the Industrial Permit and Section VI.B. of the New Industrial Permit.

96.     Plaintiff is informed and believes, and thereon alleges, that these discharges of contaminated storm water have caused or contributed to and continue to cause or contribute to an exceedance of Water Quality Standards in violation of Receiving Water Limitation C(2) of the Industrial Permit and VI.A. of the New Industrial Permit.

97.     Plaintiff is informed and believes, and thereon alleges, that from at least September 4, 2010 through June 30, 2015, Defendant has discharged contaminated storm water from the AO Reed Facility to Receiving Waters in violation of the prohibitions of the Industrial Permit, and since July 1, 2015 to the present, in violation of the prohibitions of the New Industrial Permit. Thus, Defendant is liable for civil penalties for at least 47 violations of the Industrial Permit and the CWA.

98.     Plaintiff is informed and believes, and thereon alleges, that Defendant's violations of the Industrial Permit and the CWA are ongoing.

99.     Defendant will continue to be in violation of the Industrial Permit requirements each day the AO Reed Facility discharges contaminated storm water in violation of Industrial Permit prohibitions.

100.     Every day that Defendant has discharged and/or continues to discharge polluted storm water from the AO Reed Facility in violation of the Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

101.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 4, 2010 to the present pursuant to Sections 309(d) and 505 of the CWA,

33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

102.　An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

### SECOND CAUSE OF ACTION
**Failure to Develop and/or Implement BMPs that Achieve Compliance with Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology In Violation of the Industrial Permit and the Clean Water Act (Violations of 33 U.S.C. §§1311, 1342)**

103.　Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

104.　Plaintiff is informed and believes, and thereon alleges that Defendant has failed to develop and/or implement BMPs that achieve compliance with BAT/BCT requirements of the Industrial Permit and the CWA.

105.　Sampling of the AO Reed Facility's storm water discharges as well as CERF's observations and local agency inspections of the AO Reed Facility demonstrate that Defendant has not developed and has not implemented BMPs that meet the standards of BAT/BCT. Thus, Defendant is in violation of Effluent Limitations of the Industrial Permit and New Industrial Permit.

106.　Plaintiff is informed and believes and thereon alleges that Defendant has been in daily and continuous violation of the BAT/BCT requirements of the Industrial Permit and the CWA every day since at least September 4, 2010, and of the BAT/BCT requirements of the New Industrial Permit since July 1, 2015.

107.　Plaintiff is informed and believes and thereon alleges that Defendant's violations of the Effluent Limitations and the CWA are ongoing.

108.　Defendant will continue to be in violation every day the AO Reed Facility operates without adequately developing and/or implementing BMPs that achieve

Complaint for Declaratory and Injunctive Relief and Civil Penalties

BAT/BCT to prevent or reduce pollutants associated with industrial activity in storm water discharges at the AO Reed Facility.

109. Every day that Defendant operates the AO Reed Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the Industrial Permit or New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

110. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 4, 2010 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

111. An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

## THIRD CAUSE OF ACTION
**Failure to Develop and/or Implement an Adequate
Storm Water Pollution Prevention Plan
in Violation of the Industrial Permit and Clean Water Act
(Violations of 33 U.S.C. §§ 1311, 1342)**

112. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

113. Plaintiff is informed and believes, and thereon alleges that Defendant has failed to develop and/or implement an adequate SWPPP for the AO Reed Facility that meets the requirements set out in Section A and Provision E of the Industrial Permit and Section X of the New Industrial Permit.

114. Defendant has been in violation of the SWPPP requirements every day since at least September 4, 2010.

115.     Defendant's violations of the Industrial Permit, New Industrial Permit and the CWA are ongoing.

116.     Defendant will continue to be in violation of the SWPPP requirements every day the AO Reed Facility operates with an inadequately developed and/or implemented SWPPP for the AO Reed Facility.

117.     Each day that Defendant operates the AO Reed Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a).

118.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 4, 2010 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

119.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION
### Failure to Implement an
### Adequate Monitoring and Reporting Program
### In Violation of the Industrial Permit and the Clean Water Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

120.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

121.     Plaintiff is informed and believes, and thereon alleges that Defendant has failed to develop and/or implement an adequate M&RP for the AO Reed Facility as required by Section B and Provision E(3) of the Industrial Permit and Section XI of the New Industrial Permit.

122.     Plaintiff is informed and believes, and thereon alleges, that conditions at

the AO Reed Facility, as determined via sampling of storm water discharges from the AO Reed Facility, the annual reports submitted by Defendant, and the most recent sampling data submitted by Defendant, all demonstrate that the AO Reed Facility has not implemented an adequate M&RP that meets the requirements of the Industrial Permit and New Industrial Permit.

123.    Plaintiff is informed and believes, and thereon alleges that Defendant has failed and continues to fail to identify inadequacies in its SWPPP and BMPs.

124.    Defendant's violations of the Industrial Permit, New Industrial Permit and the CWA are ongoing.

125.    Defendant will continue to be in violation of the Industrial Permit, New Industrial Permit and the CWA each day the AO Reed Facility operates with an inadequately implemented M&RP.

126.    Each day Defendant operates the AO Reed Facility without implementing an adequate M&RP for the AO Reed Facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

127.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 4, 2010 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

128.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

/././

/././

/././

## VII.    RELIEF REQUESTED

129.    Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.    A Court order declaring Defendant to have violated and to be in violation of Section 301(a) of the CWA 33 U.S.C. § 1311(a) for its unlawful discharges of pollutants from the AO Reed Facility in violation of the substantive and procedural requirements of the Industrial Permit, and as of July 1, 2015, the New Industrial Permit;

b.    A Court order enjoining the Defendant from violating the substantive and procedural requirements of the New Industrial Permit;

c.    A Court order assessing civil monetary penalties of $37,500 per day per violation for each violation of the CWA at the AO Reed Facility occurring since September 4, 2010, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

d.    A Court order requiring Defendant to take appropriate actions to restore the quality of waters impaired by its activities;

e.    A Court order awarding CERF its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d);

f.    Any other relief as this Court may deem appropriate.

Dated: November 4, 2015                    Respectfully submitted,

COAST LAW GROUP LLP


By: s/Marco A. Gonzalez
MARCO A. GONZALEZ
Attorneys for Plaintiff
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: marco@coastlawgroup.com

# EXHIBIT A

60 Day Notice Letter



1140 S. Coast Highway 101
Encinitas, CA 92024

Tel  760-942-8505
Fax 760-942-8515
www.coastlawgroup.com

**September 4, 2015**

Steven B. Andrade                    **VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED**
AO Reed and Co
4777 Ruffner Street
San Diego, CA 92111

Re:    **Clean Water Act Notice of Intent to Sue/60-Day Notice Letter**
       **AO Reed & Co. Violations of General Industrial Permit**

Dear Mr. Andrade:

Please accept this letter on behalf of the Coastal Environmental Rights Foundation (CERF) regarding AO Reed & Co. "AO Reed Owners and/or Operators") violations of the State Water Resources Control Board Water Quality Order Nos. 97-03-DWQ and 2014-0057-DWQ, Natural Pollutant Discharge Elimination System (NPDES), General Permit No. CAS000001, and Waste Discharge Requirements for Discharges of Storm Water Associated With Industrial Activities Excluding Construction Activities (General Industrial Permit).[1] This letter constitutes CERF's notice of intent to sue for violations of the Clean Water Act and General Industrial Permit for AO Reed & Co., located at 4777 Ruffner Street, San Diego, CA ("Facility" or "AO Reed"), as set forth in more detail below.

Section 505(b) of the Clean Water Act requires that sixty (60) days prior to the initiation of a citizen's civil lawsuit in Federal District Court under Section 505(a) of the Act, a citizen must give notice of the violations and the intent to sue to the violator, the Administrator of the U.S. Environmental Protection Agency, the Regional Administrator of the U.S. Environmental Protection Agency for the region in which the violations have occurred, the U.S. Attorney General, and the Chief Administrative Officer for the State in which the violations have occurred (33 U.S.C. § 1365(b)(1)(A)). This letter provides notice of AO Reed's Clean Water Act violations and CERF's intent to sue.

**I.      Coastal Environmental Rights Foundation (CERF)**

CERF is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Encinitas, CA. CERF is dedicated to the preservation, protection, and defense of the environment, the wildlife, and the natural resources of the California Coast. Members of CERF use and enjoy the waters into which pollutants from AO Reed's ongoing illegal activities are discharged into Tecolote Creek, downstream to Mission Bay, and eventually the Pacific Ocean.

The public and members of CERF use Tecolote Creek and Mission Bay to fish, sail,

---

[1] The Industrial Permit amendments, pursuant to Order No. 2014-0057-DWQ, become effective July 1, 2015. All references are to the General Industrial Permit prior to modification pursuant to Order No. 2014-0057-DWQ are to the "General Industrial Permit." All references to the Permit as modified by Order No. 2014-0057-DWQ are to the "New General Industrial Permit."

**Notice of Intent to Sue: Clean Water Act**
*AO Reed & Co.*
September 4, 2015
Page 2
_____

boat, kayak, surf, swim, scuba dive, birdwatch, view wildlife, and to engage in scientific studies. The discharge of pollutants by the AO Reed Facility affects and impairs each of these uses. Thus, the interests of CERF's members have been, are being, and will continue to be adversely affected by AO Reed Owners and/or Operators' failure to comply with the Clean Water Act and the General Industrial Permit.

## II.    Storm Water Pollution and the General Industrial Permit

### A.    Duty to Comply

Under the Clean Water Act, the discharge of any pollutant to a water of the United States is unlawful except in compliance with certain provisions of the Clean Water Act. (See 33 U.S.C. § 1311 (a)). In California, any person who discharges storm water associated with industrial activity must comply with the terms of the General Industrial Permit in order to lawfully discharge. AO Reed enrolled as a discharger subject to the General Industrial Permit on October 19, 2012 for its facility at 4777 Ruffner Street San Diego, CA, 92111.[2] On June 5, 2015, AO Reed submitted a Notice of Intent for enrollment under the New General Industrial Permit.

Pursuant to the General Industrial Permit, a facility operator must comply with all conditions of the General Industrial Permit. <u>Failure to comply with the General Industrial Permit is a Clean Water Act violation.</u> (General Industrial Permit, § C.1; New General Industrial Permit §XXI.A. ["Permit noncompliance constitutes a violation of the Clean Water Act and the Water Code..."]). Any non-compliance further exposes an owner/operator to an (a) enforcement action; (b) General Industrial Permit termination, revocation and re-issuance, or modification; or (c) denial of a General Industrial Permit renewal application. (*Id.*).  As an enrollee, AO Reed has a duty to comply with the General Industrial Permit and is subject to all of the provisions therein.

### B.    The AO Reed Facility Discharges Contaminated Storm Water in Violation of the General Industrial Permit

Discharge Prohibition A(2) of the General Industrial Permit and Section III.C. of the New General Industrial Permit prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation C(1) of the Storm Water Permit prohibits storm water discharges to surface or groundwater that adversely impact human health or the environment. In addition, receiving Water Limitation C(2) prohibits storm water discharges and authorized non-storm water discharges, which cause or contribute to an exceedance of any water quality standards, such as the CTR or applicable Basin Plan water quality standards. (See New Industrial General Permit, §III.D.; §VI.A.). "The California Toxics Rule ("CTR"), 40 C.F.R. 131.38, is an applicable water quality standard." (*Baykeeper v. Kramer Metals, Inc.* (C.D.Cal. 2009) 619 F.Supp.2d 914, 926). "In sum, the CTR is a water quality standard in the General Permit, Receiving Water Limitation C(2). A permittee violates Receiving Water Limitation C(2) when it 'causes or contributes to an exceedance of' such a standard, including the CTR." (*Id.* at 927).

_____

[2] Though AO Reed enrolled in 2012, San Diego County assessment records indicate AO Reed owned the property as early as 2003. City of San Diego permit records indicate AO Reed conducted business at the site as early as 2010. Therefore, AO Reed likely operated the Facility unlawfully for years prior to its enrollment.

**Notice of Intent to Sue: Clean Water Act**
*AO Reed & Co.*
September 4, 2015
Page 3
_____

   If a discharger violates Water Quality Standards, the General Industrial Permit and the Clean Water Act require that the discharger implement more stringent controls necessary to meet such Water Quality Standards.(General Industrial Permit, Fact Sheet p. viii; 33 U.S.C. § 1311(b)(I)(C)). The AO Reed and/or Operators have failed to comply with this requirement, routinely violating Water Quality Standards without implementing BMPs to achieve BAT/BCT or revising the AO Reed SWPPP pursuant to section (C)(3).

   The monitoring data for the AO Reed Facility indicates consistent, ongoing exceedances and violations of the General Industrial Permit. The AO Reed Owners and/or Operators have discharged and continue to discharge storm water containing pollutants at levels in violation of the above listed prohibitions and limitations during every significant rain event. AO Reed's sampling data reflects 31 discharge violations. AO Reed's own sampling data is not subject to impeachment. (*Baykeeper, supra*, 619 F.Supp. 2d at 927, citing *Sierra Club v. Union Oil Co. of Cal.*, (9th Cir. 1987) 813 F.2d 1480, 1492 ["when a permittee's reports indicate that the permittee has exceeded permit limitations, the permittee may not impeach its own reports by showing sampling error"]).

   As reflected below, for every single rain event the AO Reed Owners and/or Operators have monitored, the Facility has exceeded the CTR and benchmarks. At times, the exceedances for Zinc have been as high as almost **100 times** the benchmark. Notably, Tecolote Creek is 303(d) listed for numerous constituents, including Cadmium, Copper, Indicator Bacteria, Lead, Nitrogen, Phosphorus, Selenium, Turbidity, and Zinc. Mission Bay is also listed for Bacteria, Nutrients and Lead at the mouth of Tecolote Creek. Thus, AO Reed's discharges to these receiving waters exacerbates and contributes to their impairment.

| No. | Date | Location | Parameter | Units | Result | Benchmark/WQO |
|-----|------|----------|-----------|-------|--------|---------------|
| 1 | 12/13/2012 | #1 | pH | SU | 5.87 | 6.0-9.0 |
| 2 | 12/13/2012 | #2 | Zinc | mg/L | 2.01 | .12 |
| 3 | 12/13/2012 | #2 | Iron | mg/L | 1.8 | 1 |
| 4 | 1/25/2013 | #1 | Zinc | mg/L | 5.19 | .12 |
| 5 | 1/25/2013 | #1 | Specific Conductance | umhos/cm | 2,550 | 200 |
| 6 | 1/25/2013 | #1 | pH | SU | 2.37 | 6.0-9.0 |
| 7 | 1/25/2013 | #1 | Aluminum | mg/L | 24.7 | .75 |
| 8 | 1/25/2013 | #1 | Iron | mg/L | 3.03 | 1 |
| 9 | 1/25/2013 | #1 | Nitrate + Nitrite (N) | mg/L | .71* | .68 |
| 10 | 1/25/2013 | #2 | Iron | mg/L | 8.00 | 1 |
| 11 | 1/25/2013 | #2 | Zinc | mg/L | 11.0 | .12 |
| 12 | 1/25/2013 | #2 | Specific Conductance | umhos/cm | 2,540 | 200 |
| 13 | 1/25/2013 | #2 | Aluminum | mg/L | 1.12 | .75 |
| 14 | 1/25/2013 | #2 | Oil & Grease | mg/L | 30.6 | 15 |
| 15 | 1/25/2013 | #2 | pH | SU | 2.37 | 6.0-9.0 |
| 16 | 11/21/2013 | #1 | Oil & Grease | mg/L | 21.8 | 15 |
| 17 | 11/21/2013 | #1 | Nitrate + Nitrite (N) | mg/L | 1.21* | .68 |
| 18 | 11/21/2013 | #1 | TSS | mg/L | 405 | 100 |
| 19 | 11/21/2013 | #1 | Aluminum | mg/L | 2.77 | .75 |

**Notice of Intent to Sue: Clean Water Act**
*AO Reed & Co.*
**September 4, 2015**
**Page 4**

| 20 | 11/21/2013 | #1 | Iron | mg/L | 5.61 | .009 |
|----|-----------|----|------|------|------|------|
| 21 | 11/21/2013 | #1 | Zinc | mg/L | 11.8 | .12 |
| 22 | 11/21/2013 | #2 | Iron | mg/L | 1.59 | .009 |
| 23 | 11/21/2013 | #2 | Zinc | mg/L | 1.54 | .12 |
| 24 | 12/19/2013 | #2 | Oil & Grease | mg/L | 18.5 | 15 |
| 25 | 12/19/2013 | #2 | Zinc | mg/L | .5 | .12 |
| 26 | 12/19/2013 | #1 | Zinc | mg/L | 2.51 | .12 |
| 27 | 12/19/2013 | #1 | Aluminum | mg/L | 2.33 | .75 |
| 28 | 12/19/2013 | #1 | Iron | mg/L | 2.46 | 1 |
| 29 | 12/19/2013 | #1 | Specific Conductance | umhos/cm | 240 | 200 |
| 30 | 12/19/2013 | #1 | Nitrate + Nitrite (N) | mg/L | 4.78* | .68 |
| 31 | 12/19/2013 | #1 | TSS | mg/L | 220 | 100 |

*Analytical Results included Nitrate-N and Nitrite-N individually. The benchmark is for total Nitrate and Nitrite so the two figures were added together.

Every day AO Reed Owners and/or Operators discharged or continue to discharge polluted storm water in violation of the Discharge Prohibitions and Receiving Water Limitations of the General Industrial Permit and New General Industrial Permit is a separate and distinct violation of the Permits and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).The AO Reed Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since AO Reed's enrollment and prior to such enrollment in light of AO Reed's industrial operations at the Facility prior to its enrollment. These violations are ongoing and will continue each day contaminated storm water is discharged in violation of the requirements of the Permits.

### C. Inadequate Storm Water Pollution Prevention Plan

One of the main requirements of the General Industrial Permit (and New General Industrial Permit) is the Storm Water Pollution Prevention Plan (SWPPP). (General Industrial Permit §A; New General Industrial Permit, Finding I.54, §X). AO Reed has not developed an adequate SWPPP as required by the Permits.

The AO Reed SWPPP dated May 18, 2015 fails to assess the Facility's potential contribution of 303(d) listed pollutants to receiving waters. Per section X.G.2.a.ix of the New General Industrial Permit the AO Reed Owners and/or Operators are required to assess the potential industrial pollutant sources to receiving waters with 303(d) listed impairments identified in Appendix 3. (New General Industrial Permit, §X.G.2.a.ix). Though the SWPPP identifies the numerous pollutants for which Tecolote Creek is listed, the requisite analysis is missing. The SWPPP identifies Lead, Cadmium and Copper as constituents which will be monitored because they are 303(d)-listed constituents, but fails to indicate why Selenium and Phosphorous were omitted.

Lastly, despite the consistent and continuous water quality violations established by AO Reed's monitoring data, the SWPPP BMPs have not been updated to address such exceedances. Indeed, the only treatment control BMP onsite has been in place since the Facility enrolled under the General Industrial Permit. (See SWPPP, p. 4-1).

Every day the AO Reed Owners and/or Operators operate the Facility without an

adequate SWPPP constitutes a separate and distinct violation of the General Industrial Permit, the New General Industrial Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The AO Reed Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit since at least September 1, 2010. These violations are ongoing and the AO Reed Owners and/or Operators will continue to be in violation every day they fail to address the SWPPP inadequacies. Thus, the AO Reed Owners and/or Operators are liable for civil penalties of up to $37,500 per day of violation for 1,830 violations of the General Industrial Permit and the Clean Water Act.

### D.     Failure to Monitor

The AO Reed Owners and/or Operators have failed to sample as required during the 2014-2015 wet season. Only one rain event was monitored, though AO Reed's neighbor, TTM Technologies, located at  5037 Ruffner St, was able to sample twice during this wet season. TTM sampled on 12/2/2014, as did AO Reed, but also sampled on 12/12/2014. According to TTM's Annual Report, this rain event began at 5:45 AM, just before AO Reed's business opened. The San Diego Transit Board, located at 4630 Ruffner St, also sampled on the morning of 12/12/2014. Thus, AO Reed could and should have monitored this rain event.

Sections B(5) and (7) of the General Industrial Permit require dischargers to visually observe and collect samples of storm water discharged from all locations where storm water is discharged. Facility operators, including the AO Reed Metal Forming, Inc. Owners and/or Operators, were required to collect samples from at least two qualifying storm events each wet season, including one set of samples during the first storm event of the wet season.

The AO Reed, Inc. Owners and/or Operators have failed to meet these monitoring requirements for the 2014-2015 wet season, despite the fact that another qualifying rain event occurred on 12/12/2014.

Every day the AO Reed. Owners and/or Operators failed to adequately monitor the Facility is a separate and distinct violation of the General Industrial Permit, New Industrial Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These violations are ongoing and the AO Reed Owners  and/or Operators will continue to be in violation every day they fail to adequately monitor the Facility. The AO Reed Owners and/or Operators are thus subject to penalties in accordance with the General Industrial Permit – punishable by a minimum of $37,500 per day of violation. (33 U.S.C. §1319(d); 40 CFR 19.4).

### III.    Remedies

Upon expiration of the 60-day period, CERF will file a citizen suit under Section 505(a) of the Clean Water Act for the above-referenced violations. During the 60-day notice period, however, CERF is willing to discuss effective remedies for the violation noted in this letter. If you wish to pursue such discussions in the absence of litigation, it is suggested that you initiate those discussions immediately. If good faith negotiations are not being made, at the close of the 60-day notice period, CERF will move forward expeditiously with litigation.

AO Reed must develop and implement a SWPPP which complies with all elements required in the New General Industrial Permit, and address the consistent, numerous, and ongoing water quality violations at the Facility. Should the AO Reed Owners and/or Operators

**Notice of Intent to Sue: Clean Water Act**
*AO Reed & Co.*
**September 4, 2015**
**Page 6**

fail to do so, CERF will file an action against AO Reed for its prior, current, and anticipated violations of the Clean Water Act.

CERF's action will seek all remedies available under the Clean Water Act §1365(a)(d). CERF will seek the maximum penalty available under the law which is $37,500 per day. CERF may further seek a court order to prevent AO Reed from discharging pollutants. Lastly, section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing parties to recover costs, including attorneys' and experts' fees. CERF will seek to recover all of its costs and fees pursuant to section 505(d).

## IV.  Conclusion

CERF has retained legal counsel to represent it in this matter. Please direct all communications to Coast Law Group:

> **Marco A. Gonzalez**
> **COAST LAW GROUP LLP**
> **1140 S. Coast Highway 101**
> **Encinitas, CA 92024**
> **Tel: (760) 942-8505 x 102**
> **Fax: (760) 942-8515**
> **Email: marco@coastlawgroup.com**

CERF will entertain settlement discussions during the 60-day notice period. Should you wish to pursue settlement, please contact Coast Law Group LLP at your earliest convenience.

Sincerely,

**COAST LAW GROUP LLP**

**Marco A. Gonzalez**

**Livia Borak**
Attorneys for
Coastal Environmental Rights Foundation

cc:

| | |
|---|---|
| **Jared Blumenfeld, Region 9 Administrator**<br>**Alexis Strauss, Deputy Regional Administrator**<br>**U.S. EPA, Region 9**<br>**75 Hawthorne Street**<br>**San Francisco, CA, 94105** | **Dave Gibson, Executive Officer**<br>**Catherine Hagan, Staff Counsel**<br>**San Diego Regional Water Quality Control Board**<br>**2375 Northside Drive, Suite 100**<br>**San Diego, CA 92108-2700** |
| **Gina McCarthy**<br>**EPA Administrator**<br>**Mail Code 4101M**<br>**USEP A Ariel Rios Building (AR)**<br>**1200 Pennsylvania Avenue N.W.**<br>**Washington, DC 20004** | **Thomas Howard**<br>**Executive Director**<br>**State Water Resources Control Board**<br>**P.O. Box 100**<br>**Sacramento, CA 95812–0110** |